William Columbus Flanagan et al., Appellees, v. City of Chicago et al., Appellants.

Gen. No. 41,113.

136

Heard in the second division of this court for the first district at the February term, 1940. Opinion filed July 1, 1941.

BARNETT HODES, Corporation Counsel, for appellants; WALTER V. SCHAEFER and EDWARD J. KELLY, Assistant Corporation Counsel, of counsel.

MASON & MASON and RATHJE, HINCKLEY, BARNARD & KULP, both of Chicago, for appellees; JOSEPH J. SULLIVAN, JR., of Chicago, and GEORGE A. MASON and FRANCIS E. HINCKLEY, of counsel.

MR. JUSTICE JOHN J. SULLIVAN delivered the opinion of the court.

A decree was entered in this cause which after finding that the equities were with plaintiffs, that this proceeding was properly instituted and maintained as a representative suit and that $515,839.29 remained in the special assessment fund involved herein available for rebate to the owners of private property assessed to pay the cost of the construction of the Wacker Drive Improvement, ordered that $60,000 be deducted from the aforesaid sum and paid to the attorneys for plaintiffs for legal services performed and to be performed by them and that the balance of said sum should be rebated pro rata to the parties entitled thereto. The defendants appeal from the decree.

On September 14, 1937, William Columbus Flanagan, on behalf of himself and others similarly situated, filed his sworn complaint in equity to compel defendants, City of Chicago and certain of its officials (hereinafter for convenience sometimes referred to collec-

tively as the city), to account for all moneys collected and expended by the city by reason of a special assessment levied and confirmed in the county court of Cook county, Case No. 46221, for the construction of a double deck highway on East River street and East and West South Water street, on North Michigan avenue to West Lake street and on Market street to the first alley south of Randolph street (Wacker Drive Improvement) and to refund to all assessees and persons who paid the assessment any sums collected which were unexpended and subject to rebate.

The complaint alleged substantially that the Wacker Drive Improvement had been constructed in 1926, which was eleven years before the filing of this suit; that, although the statutes of the State of Illinois provide that a final certificate of cost and completion shall be filed within 30 days after a local improvement is completed, none had been filed as to this improvement; that the fund collected by the assessment for the Wacker Drive Improvement was a trust fund to be held by the City of Chicago for the benefit of plaintiff, William Columbus Flanagan, and others similarly situated, to be used for the sole and exclusive purpose of the construction of the improvement and that it was the duty and obligation of the trustee to rebate or refund to the owners of all properties assessed any money which was left over after the improvement had been completed; that all bonds and vouchers issued on account of this improvement, as well as interest on such bonds and vouchers and expenses incurred in connection with said improvement had been paid and that there was in the special assessment warrant a surplus of approximately $1,000,000, which should have been rebated or refunded to the parties entitled thereto; that the city had diverted this trust fund for corporate purposes other than those allowed under the trust, used it in its aggregate of funds and threatened the use of it for other purposes; that, although repeated

demands had been made upon it for rebate or refund, the city failed and still fails and refuses to rebate this surplus trust money; that the plaintiff "has instituted and is maintaining this suit on behalf of himself, and on behalf of all other property owners who have been assessed for or paid said special assessments" for the Wacker Drive Improvement; that "the plaintiff and all of the other said property owners have a common interest in the subject matter of this suit"; that "there exists a common right sought to be enforced in this cause, and plaintiff undertakes to represent the right of all of such property owners and to maintain and conduct this suit as a representative class suit for the benefit of all said property owners"; that the expenses, court costs and attorneys' fees should be paid out of the fund recovered; and that a multiplicity of suits were threatened against the city.

The complaint concluded with a prayer for an accounting of the moneys collected, spent and diverted, that the court determine the manner of the distribution of the surplus fund, that the city be ordered to rebate to the parties entitled thereto the amounts found to be due and owing to them, that an injunction issue to restrain the city from diverting the trust fund for other corporate purposes, that an injunction also issue to restrain others from instituting actions against the city for the relief sought herein and that the fees, expenses and costs incident to this proceeding be determined and ordered paid.

In their sworn answer defendants denied that there was any money in the special assessment warrant involved herein which constituted a surplus the assessees were entitled to receive or which should have been or should now be rebated to them or any of them.

On May 6, 1938, plaintiff filed an amended and supplemental complaint, which contained practically the same allegations and prayer for relief as did the original complaint. It did, however, contain an additional prayer that the city be ordered to file its final

certificate of cost and completion in the county court and it made approximately one hundred and thirty additional parties plaintiff. Subsequently, by a further amendment, one hundred and sixty-one more additional parties plaintiff were named.

On May 28, 1938, defendants filed their sworn answer to the amended and supplemental complaint in which they admitted that there was $1,099,528.22 subject to rebate in their possession in the special assessment fund in question.

On January 9, 1939, plaintiffs filed another amendment to their amended and supplemental complaint wherein they alleged that in compliance with the order of the circuit court theretofore entered on plaintiffs' motion the city had filed its certificate of final cost and completion, ''In the Matter of Special Assessment of the City of Chicago for improving East and West South Water Street,'' etc. (Wacker Drive Improvement), Docket No. 46221, Warrant 50075 in the county court of Cook county; that there had been a hearing on said certificate in said court; that the county court had entered an order confirming and approving the certificate, which order was final and unappealable; and that there was now in the fund $1,120,598.12 subject to distribution to the owners of the private property included in the assessment and to the City of Chicago.

Defendants' answer to the amended and supplemental complaint was allowed to stand as its answer to the foregoing amendment.

Except for the testimony of three attorneys who testified in behalf of plaintiffs as to the reasonable value of the services rendered by the attorneys for plaintiffs, this case was submitted for determination in the trial court upon a ''Statement of Agreed Facts,'' the pertinent portions of which are as follows:

''That on June 29, 1922, an ordinance was passed by the City Council of the City of Chicago providing for the erection and construction by special assess-

ment of a double decked highway on East River street and East and West South Water street, on North Michigan avenue to West Lake street, and on Market street to the first alley south of Randolph street; that following the passage of said ordinance the City of Chicago filed, on August 16, 1922, its petition in the County Court of Cook County, Illinois, in Case No. 46221, seeking confirmation of the improvement provided for in the said ordinance; that on October 16, 1922, the Commissioners' Report and Assessment Roll was filed in said cause, in which roll an assessment of $8,727,000 was assessed against private property and no sum was assessed against the public as a public benefit; that on a hearing before the court on August 15, 1924, a public benefit of 35% was charged against the city amounting to $3,054,450; that subsequently the said Commissioners' Report and Assessment Roll was further modified by charging against the city as an additional public benefit amounts which raised the public benefit to $4,242,849.79, an additional increase of $1,188,399.79, and that said roll as modified was confirmed in the said court; that the assessment roll as confirmed amounted to $8,702,810.81 and, as changed in red ink after judgment to conform to the judgment of confirmation showed that $4,242,849.79 was assessed against the city as a public benefit and $4,459,961.02 was assessed against private property for benefits received; that the assessed district extends north and south from Twelfth street to North avenue, a distance of approximately three miles, and east and west approximately from Halsted street to Lake Michigan, a distance of approximately one mile, and included 12,533 separate parcels of property assessed, and 5,078 owners as assessees.

"That all of the requisite proceedings and steps provided by law for the levying, confirmation and certification of special assessments for the benefits inuring to all properties on account of the improve-

ment hereinabove described have been taken; that all of the said properties were assessed pursuant to the said ordinance, which assessments were modified and, as modified, finally confirmed by final judgment order entered in the above cause No. 46221 on August 27, 1924; that after judgment all necessary steps were taken to put the said special assessment into collection; that the said special assessment was described in the records of the City of Chicago as Special Warrant No. 50075.

"That after the order of confirmation was entered the City of Chicago, through its Board of Local Improvements, advertised and received bids for the construction of the improvement above described; that the total amount of bids received for the cost of construction of the above improvement amounted to $6,994,194.22, and that 23 contracts were entered into pursuant to said bid prices; that the said contracts were executed in the year 1925, in which year construction work started; that the said improvement was constructed in substantial compliance with the ordinance in the year 1927 so as to fully comply with Section 84 of the Local Improvement Act.

"That Section 84 of the Local Improvement Act required that the city should file its final certificate of cost and completion within thirty days after the completion of the above described improvement; that the certificate was filed on May 27, 1938, after order of this court in this cause.

"That from April to September in 1937, on behalf of the plaintiffs and other assessees, Joseph J. Sullivan and William C. Hartray made numerous investigations in the City Hall and of the cause itself relative to the question of the filing of the final certificate and of the rebate to be paid out of Warrant No. 50075, the warrant in the South Water Street case; that they found the assessment entered against the property amounted to $8,702,810.81, the bid price on the con-

tracts and construction work amounted to $6,994,-194.22; that prior to the institution of this suit there was credited to the said Warrant Account a substantial amount of money after all bonds had been retired and all contracts paid in full; that Joseph· J. Sullivan and William C. Hartray made oral demands on the president and secretary of the Board of Local Improvements of the City of Chicago on behalf of their clients requesting the filing of the final certificate of cost and completion, and demanding that a proper rebate be made to all parties in interest, but that said request was not complied with and it was stated by the city officials, Arthur A. Sullivan, attorney for the Board of Local Improvements, and Paul Lemke, paving assessor, charged with the duty of making up the certificate of costs and final completion, that the amount of money shown in Warrant No. 50075 was credited there through error of a clerk in charging the public benefits against the City of Chicago and in modifying the roll and that instead of any rebate coming to the assessees that there was really a deficit of $28,000; that this examination of files, records, contracts and reports took practically all of the spring and summer of 1937.

"That Joseph J. Sullivan and William C. Hartray then prepared and filed in this Court on September 14, 1937, as a class suit, a complaint for an accounting in this cause in a representative capacity on behalf of the plaintiffs and other assessees in the South Water Street Improvement case; that paragraph ten of the said bill of complaint charged:

" 'That there is now in Special Assessment Warrant No. 50075, which is the Warrant or Account having to do with the improvement above described, after all bonds and vouchers and interest thereon and expenses have been paid, approximately over One Million Dollars ($1,000,000.00), which sum of money has been in the Warrant for a long period of time and which sum

should be distributed pro rata to those who have paid the assessment for the construction of the improvement above described.'

"That the defendants filed their sworn answer to the said complaint on December 15, 1937, and in paragraph seven of said answer they deny that there is any money in the said Warrant subject to distribution; that said paragraph seven is in words and figures, as follows, to-wit:

" 'They admit the allegations of paragraph ten of said complaint referring to the provisions of the laws of the State of Illinois as to the rebate of any surplus, but deny that there ever was, or now is a surplus in Special Assessment Warrant No. 50075 as defined or contemplated by the said statutes of the State of Illinois, and deny that any money at present in said Special Assessment Warrant constitutes a surplus as defined or contemplated by the statutes of the State of Illinois, and deny that the plaintiff, or those in whose behalf this suit is alleged to be brought, is or are entitled to any moneys in said fund, and deny that any moneys in said fund should be distributed.'

"That prior to the filing of the said bill of complaint on September 14, 1937, Joseph J. Sullivan had been in contact with the Law Department of the Board of Local Improvements relative to the filing of the final certificate of cost and completion as required by Section 84 of the Local Improvement Act; that he was advised by said law department that those in the Board of Local Improvements in charge of the filing of said certificate had prepared a certificate showing a deficit of $28,000.00 to be charged against, instead of a surplus to be paid from, the Warrant No. 50075, and that they were of the opinion that the assessment roll had been improperly modified to charge a large public benefit against the City of Chicago without any authority.

"That Joseph J. Sullivan examined and had examined the files, records and orders of the County

Court for the purpose of sustaining the roll as modified; that there are approximately two hundred lawyers who had filed objections for assessees in the original South Water Street case; that there were 12,533 pieces of property assessed and 5,078 owners of said properties listed as assessees; that reduction orders had been entered reducing the assessments for practically every piece of property in the assessed district; that the orders ran into many hundreds; that all the orders referring to the question of public benefits had been taken from the files and were lost; that it then became necessary to search through the volumes containing orders for the South Water Street Improvement and that, after a great deal of search and time spent in endeavoring to discover the orders entered by the County Court justifying the modification of the roll as it had been made, the said Joseph J. Sullivan was able to present to the Law Department of the City of Chicago orders of the County Court to sustain the roll as modified on its face; that from the filing of the complaint in the above matter on September 14, 1937, up to and after the filing of the interrogatories on February 14, 1938, and before the same were answered on May 27, 1938, the said Joseph J. Sullivan was in almost constant contact with the Board of Local Improvements, the attorney for the Board of Local Improvements, the records of the County Court, and had made investigations to determine the cost of the said improvement for the purpose of presenting proper evidence to the City as to why a final certificate of cost and completion should be filed in the County Court showing a substantial surplus instead of a deficit; that after many conferences had been had with the Law Department of the City of Chicago and after the evidence gathered by the said Joseph J. Sullivan had been presented to the said City Law Department, the said City agreed that when the interrogatories were answered and the final certificate

of cost and completion was filed, they would show that an amount in Warrant No. 50075 amounting to over One Million Dollars ($1,000,000.00) would be subject to distribution to the assessees, including the City of Chicago.

"That after the filing of the said interrogatories on February 14, 1938, until May 28, 1938, Joseph J. Sullivan was in continuous communication with and spent a great deal of time with James Todd, an adviser to the Finance Committee of the City of Chicago, who was charged with the preparation of the answers to the interrogatories, assisting him with information which the said Joseph J. Sullivan had discovered, so that the interrogatories could be truthfully answered; that in the answers to said interrogatories the defendants admitted the following:

"In answer to Interrogatory No. 5, they admitted the total amount confirmed for the assessment totalled ..............$8,727,000.00

"In answer to Interrogatory No. 10, they admitted the amount confirmed against private property as shown in the roll was ................................ 4,459,961.02

and against the public was........... 4,242,848.79

"In answer to Interrogatory No. 23, the defendants admitted that the cost of the double decked highway on East River Street, East and West South Water Street, etc., (County Court Docket No. 46221, City of Chicago Warrant No. 50075) and charged against the assessment under said Warrant was the sum of .............·.................. 8,003,743.44

"In answer to Interrogatory No. 32, they admitted that there was in Warrant No. 50075 and unrebated to the assessees at the time of the filing of the

answers to the said interrogatories, the sum of ......................... 1,099,528.22

"In answer to Interrogatory No. 50, the defendants admitted that all warrants had been paid; that none were outstanding, with the exception of one for . 9.10 and one for ......................... 5.15

"That in answer to Interrogatory No. 52, the defendants admitted that there was still the sum of................. 87,871.02 assessed against and uncollected from private property.

"That when this cause came on before this Court on May 6, 1938, this Court, on motion of Joseph J. Sullivan and William C. Hartray, ordered and directed the defendant herein, City of Chicago, to file, within ten days after the entry of the order, its final certificate of cost and completion in the County Court, which final certificate was filed on May 27, 1938.

"That after the said final certificate of cost and completion had been filed in the County Court, Joseph J. Sullivan and William C. Hartray served notice on the City of Chicago to set the same down for hearing; that Judge Jarecki set the said cause for hearing on July 5, 1938; that said cause was continued from time to time and came on for trial on September 2, 1938; that from the 2nd day of September up until November 23, 1938, the said cause was continuously on trial; that only three attorneys filed objection to the final certificate; that Joseph J. Sullivan and William C. Hartray filed objections to the cost of the improvement but admitted that the improvement had been built in substantial compliance with the ordinance; Howard Bishop filed objections both to the cost and to the completion of the improvement; George A. Mason filed general objections to both but did not appear in the trial of the case; that when the said cause came on

for trial, Joseph J. Sullivan was the only counsel, together with C. Helmer Johnson (partner of William C. Hartray, who died during the trial), in behalf of the assessees presenting any evidence endeavoring to reduce the cost of the improvement; that Joseph J. Sullivan had had accountants examine the records of the Board of Local Improvements as to the amount of moneys which had come into Warrant No. 50075; that ,the said Joseph J. Sullivan had spent many days and evenings with Arthur Evans, who was the engineer in charge of the South Water Street Improvement and who had been out of the employ of the City of Chicago for a long period of time, for the purpose of determining the proper cost of the improvement; that from the examinations that had been made by Joseph J. Sullivan and his associate they discovered that the bid price for the work amounted to a total of $6,994,194.22; that the cost of the work as set out by the City in the final certificate was the sum of $8,003,742.44, which made a difference of $1,009,548.22; that Joseph J. Sullivan, after a long search and investigation and working with Mr. Evans, who kept a complete file of the South Water Street Improvement, together with the charge for extras, and after studying the engineer's estimate, the ordinance, the bid sheets, the certificates and accounts for extras, Joseph J. Sullivan and Mr. Evans concluded that overcharges amounting to $283,053.60 could be successfully advanced against the cost of the improvement; that these extras were as follows:

"For work done in connection with the
  columns and equipment of the Chicago
  Rapid Transit Company ..............$151,900.58
"Temporary structures to carry street-car
  traffic over South Water Street........ 35,000.00
"Heating of work done during the winter
  time ................................. 17,707.90
"Changes in South Water Street structure
  due to future Wabash Avenue approach. 40.000.00

"Paving of approach street to South Water
   Street ............................... 6,215.17
"Removal of public utility spoils......... 11,180.12
"Overcharge on 5% cost item............ 21,049.83

"That in attempting to deduct the charge of $151,-900.58 from the total cost item, Joseph J. Sullivan investigated files of the *City of Chicago vs. Rapid Transit Company,* Circuit Court No. 13944, wherein the City brought a law suit against the Rapid Transit Company and in a sworn declaration signed by J. J. Sloan, the President of the Board of Local Improvements, alleged that $250,000.00 was spent for the Rapid Transit Company in the construction of the South Water Street improvement and taken out of Warrant No. 50075, and, substantiating said claim against the said Rapid Transit Company, Joseph J. Sullivan likewise investigated the files and records in the case of *Westinghouse Electric Manufacturing Company vs. Chicago Rapid Transit Company,* in equity, No. 12,035 in the District Court of the United States, for the Northern District, Eastern Division, a proceeding in bankruptcy against the Chicago Rapid Transit Company, wherein the City of Chicago under oath stated that $116,565.73 was paid out of Warrant No. 50075 for work in connection with the Rapid Transit Company lines, which work should be paid for by the Rapid Transit Company; that Joseph J. Sullivan produced all copies of the ordinances granting franchises to the Rapid Transit Company and its predecessors, numbering some fourteen ordinances, and subpoenaed in the vouchers and engineer's certificates that were issued out of the money assessed for the work, and produced the engineer who made up the estimates; that all of the other items referred to as extras were established by the engineer in charge, Mr. Evans, who kept memoranda of all charges and who made the certificates for the payment thereof.

"That none of the above items were itemized in the engineer's estimate, nor provided for in the ordinance, and after trial on September 2, 1938 to November 23, 1938, that the Court reduced the cost of the improvement $21,049.83.

"That in the trial of the South Water Street case on the final certificate of cost and completion, Howard Bishop, representing a certain objector, the Pure Oil Building, attempted to defeat the certificate on the ground that the improvement had not been completed for the following reasons, to-wit: ·

"That Holden Court had not been completed and that the sum of $640,000.00 should be held back from distribution for that purpose;

"That the ventilating system had not been completed and the sum of $120,000.00 should be held back from distribution for that purpose;

"That other parts of the improvement provided for in the ordinance, such as—railing in front of the proposed Holden Court, the building of the approach on Wells Street to South Water Street, and removal of certain obstructions, such as pillars, on South Water Street,—for which purpose the sum of $30,000.00 should be held back from distribution; making a total of $790,000.00 which would not be available for distribution if the Court should find for Mr. Bishop; that Joseph J. Sullivan and C. Helmer Johnson, representing the assessees, very vigorously opposed Mr. Bishop's contention in this matter, and that the Court in its opinion rendered on the 23rd day of November, 1938, held that the improvement was completed in substantial compliance with the ordinance, and directed that the final certificate of cost and completion be amended to reduce the cost by the sum of $21,049.83.

"  .  .  .

"That from the time the final certificate of cost and completion was filed, on May 27, 1938, up until December 31, 1938, when the final certificate was ap-

proved, approximately seven months, Joseph J. Sullivan devoted fully four months in court work to sustaining said final certificate as to work being completed and attempting to reduce the cost; that from the time, in the summer of 1937, when Joseph J. Sullivan and William C. Hartray started to prepare their complaint in equity for the above Flanagan case, up until the 31st day of December, 1938, Joseph J. Sullivan, assisted by William C. Hartray, and after the death of William C. Hartray by C. Helmer Johnson, has spent more than one year of actual work in the above Flanagan case and in the South Water Street improvement case hearing on the final certificate.

"That since the order of the County Court on December 31, 1937, confirming the final certificate of cost and completion the respondent Wacker-Wabash Corporation, formerly the Pure Oil Building, has taken an appeal from said order returnable to the June Term of the Supreme Court of Illinois, and has filed in said cause a record of proceedings of over 1300 pages, with hundreds of pages of exhibits, an abstract of 224 pages and a brief of 64 pages; that it has been necessary for Joseph J. Sullivan and C. Helmer Johnson to examine said record, abstract and brief, and they have filed, on June 6, 1939, in the Supreme Court of the State of Illinois a reply brief of 30 pages seeking to sustain the order of the County Court approving the final certificate.

"That since the first investigations made by Joseph J. Sullivan and William C. Hartray in the spring of 1937 of the accounts and records of the City of Chicago, the examination of contracts and specifications of the South Water Street improvement, which were very voluminous, the records of the South Water Street improvement case, the preparation for trial of both the instant and the South Water Street cases, the trial of the South Water Street case, and the resisting of the appeal of the Wacker-Wabash Corpora-

tion to the Supreme Court, Joseph J. Sullivan and his
associates have spent fully two years in these causes."

Defendants' theory is "that under the Local Im-
provement Act the only court which has jurisdiction to
determine the existence of a surplus or deficit result-
ing from the levy of a special assessment and the
construction of a local improvement under the provi-
sions of the Act is the court in which the special assess-
ment proceeding is pending; that mandamus is a com-
plete and adequate remedy to compel the filing of a
final certificate of cost and completion in accordance
with Section 84 of the Local Improvement Act when
a city fails to file such a certificate; that by the filing
and prosecution of a purported representative suit no
right to attorneys' fees from amounts to be rebated
to owners of private property assessed to pay the cost
of the improvement can be established; and that in
the case at bar the suit was prematurely filed because
the existence or nonexistence of any surplus available
for rebate had not been determined by the court which
had exclusive jurisdiction to determine that question."

The theory of plaintiffs as stated in their brief is
"that the funds collected in a special assessment pro-
ceeding constitute a trust fund to be held in trust for
the sole purpose of paying the cost of the improvement
and rebating or refunding the surplus to the owners of
the properties assessed; that when an improvement
has been completed and the municipality fails for ten
years to file its certificate of cost and completion when
the statute requires such certificate to be filed within
thirty days after the completion of the improvement,
and fails and refuses to refund to property owners
assessed the surplus which has accumulated in the spe-
cial assessment warrant but converts or is about to
convert to its own use such trust surplus, a complaint
in chancery will lie; (a) for the purpose of requiring
the municipality to account for this fund and to dis-
tribute it properly to owners assessed pro rata as their

interests appear, (b) to enjoin the wrong use, dissipation or conversion of this fund, (c) to require the municipality to comply with the law and file in the Court where the assessment was confirmed its certificate of cost and completion; that the Circuit court of Cook county has power under the State Constitution to administer trusts, which right cannot be taken away by an act of the General Assembly; that a suit to compel such an accounting may be instituted as a representative suit by a single person or a number of persons where the owners are numerous and constitute many thousands of property owners assessed, where the plaintiff or plaintiffs have a common, like pro rata interest in the subject matter and the fund, where the plaintiffs or plaintiffs' rights are not antagonistic or adverse to the other property owners, and where the plaintiff or plaintiffs are beneficiaries of the said trust fund and under the decree will be entitled to share therein as their respective interests may appear, and that in such suit, being representative in character, fees for the plaintiffs or plaintiffs' attorneys may be allowed from any fund determined by the Court of Equity to be available for rebate.''

Defendants conclude their reply brief with the following statement:

''The city holds a very substantial sum of money which is to be rebated to those who paid the assessments levied for the improvement of Wacker Drive. If the rebate is made in accordance with the Local Improvement Act and with the order of the County Court all of the available money will be rebated to those who paid the assessments. If the rebate is made in accordance with the decree in the case at bar the amount to be rebated to those who paid the assessments will be reduced by the sum of $60,000, which will be paid to the attorneys for the plaintiffs.''

The history of the special assessment involved in this proceeding makes it quite obvious that the city's

solicitude for the welfare of the private property owner assessees is rather belated. It would seem from the foregoing statement that the city's primary purpose in prosecuting this appeal is to deprive plaintiffs' attorneys of their right to the fee allowed for the legal services rendered by them over a period of more than two years, which fee it is conceded is not excessive in view of the character and extent of the services rendered by them in behalf of the assessees. Under the decree the city is not required to pay one cent of such attorneys' fee and not one of the property owners out of whose collective rebates said fee is payable has seen fit to attack either the allowance or the amount of the fee. It must be borne in mind in this connection that it was the utter failure of the city for more than 10 years to comply with the provisions of the Local Improvements Act (ch. 24, par. 698 *et seq.*, Ill. Rev. Stats. 1939 [Jones Ill. Stats. Ann. 76.003 *et seq.*]) that necessitated the rendition of the services by plaintiffs' attorneys, for which the decree ordered that they be compensated.

The city contends that "the Circuit Court was without jurisdiction of the subject matter of this case" because "by the Local Improvement Act the court in which the special assessment is confirmed is given exclusive jurisdiction to determine the cost of a local improvement constructed by special assessment and to determine whether or not a surplus exists" and because "the remedy of the plaintiffs at law is plain, adequate and complete." There is no merit in this contention.

While it is true that the Local Improvements Act confers upon the county court which confirms an assessment exclusive jurisdiction to determine the cost of a local improvement constructed by special assessment and to determine whether or not a surplus exists upon the filing of a certificate of cost and completion, and while it is also true that upon the failure of the

city to file such certificate it could be compelled to file same by a proceeding in mandamus, it does not follow that such remedy would be adequate or complete. Whether the city files a certificate of cost and completion in the county court voluntarily or under compulsion, the only authority that court has under section 84 of the Local Improvements Act is to determine whether or not a surplus exists and if the cost of the improvement is less than the amount of the assessment to rebate unpaid assessments pro rata to the extent of such surplus. In this case the assessments were practically all collected and it clearly appears that under the foregoing section all that the county court could do was determine that a surplus did exist and the amount thereof, thereby affording each of the assessees the basis for an action in assumpsit against the city for his share of the surplus in the event the city still persisted in its refusal to pay same.

This proceeding in equity was not instituted until after plaintiffs' attorneys had importuned the city over a period of several months to file its certificate of cost and completion, which it should have filed under the statute within 30 days after the completion of the improvement or more than 10 years previously. The officials of the city repeatedly denied that there was any surplus in the assessment fund in question, and, even after the original plaintiff was forced to bring this action to secure relief for himself and the other assessees, the city persisted in its denial in its answer to the original complaint that there was any surplus in such fund for rebate.

As heretofore shown, under section 84 of the Local Improvements Act the county court has no power after it determines that there is a surplus in a special assessment fund to order or compel the proper distribution of such fund by the city where the assessments have been paid. The filing of a certificate of cost and completion in the county court by the city and the

determination by that court that a surplus exists is merely incidental to the relief sought by plaintiffs in this cause.

There can be no question but that the surplus in the hands of the city of the assessments collected over and above the cost of completion of the project constituted a trust fund of which the assessees are the beneficiaries and the city the trustee. It has been repeatedly held that the proceeds of special assessments are trust funds for the payment of bonds issued for the cost of improvements. (*Conway v. City of Chicago*, 237 Ill. 128; *Rothschild v. Village of Calumet Park*, 350 Ill. 330.) It necessarily follows that special assessment collections over and above the cost of the completion of the improvement must be trust funds held by the city as trustee for the benefit of the assessees.

Section 93 of the Local Improvements Act provides in part as follows:

"If, upon final settlement with the contractor for any improvement and full payment of all vouchers or bonds, issued on account of such contract, there shall be any surplus remaining in such special assessment or special tax above the payments aforesaid and above the amount necessary for the payment of interest on such vouchers or bonds as above provided, it shall be the duty of the proper authorities of such city, incorporated town or village to at once cause a rebate to be declared upon each lot, block, tract or parcel of land, assessed of its pro rata proportion of such surplus."

Under this section it was mandatory for the city as trustee to distribute the surplus trust funds in its hands *at once*. Instead of doing so, it kept and concealed said funds for more than 10 years. The city must have known how much it had collected and how much it had paid out. Therefore it must also have known the amount of the surplus in its hands belonging

to the assessees. It knew that the work was completed in compliance with the city ordinance authorizing the improvement, yet it not only made no attempt to distribute said surplus but it refused to do so, notwithstanding plaintiffs' insistent demands.

Where, as here, the existence of the trust fund belonging to the private property owner assessees was denied, the beneficiaries of said fund had the right to invoke the broad powers of a court of equity to discover the fund and compel its distribution, and since the city by its denial of the existence of the trust fund and its concealment of same for more than 10 years forced plaintiffs to resort to equity for relief, it will not be heard to say that the court of chancery lacked jurisdiction of plaintiffs' complaint.

Since it was necessary under section 84 of the Local Improvements Act that the amount paid by the city for the construction of the improvement, the amount collected in assessments and the amount of the surplus be determined by the county court, the chancellor referred those matters to that court by directing the city to file its certificate of cost and completion therein. When the county court found that the improvement had been completed as provided by the city ordinance and further found the amount of the cost of such improvement, the amount of the assessments collected and the amount of the surplus held by the city, the chancellor properly resumed jurisdiction to enter the decree herein, all necessary procedural steps having been taken to make the surplus or trust fund available for refund.

Notwithstanding that the county court has exclusive jurisdiction under section 84 of the Local Improvements Act to determine the cost of the improvement and to pass upon the final certificate of cost and completion, nevertheless the circuit court had jurisdiction in this case to require the city to file such certificate of cost and completion in the county court so that an

adjudication of same might be had and to thereafter make such disposition of the surplus as it should direct in declaring refunds to the assessees. Where it is essential for a complete determination by a court of chancery of a controversy of an equitable nature that an issue of law outside of the jurisdiction of a court of equity be referred to a court of law for decision, it has been the recognized and long established practice that such reference be made, the chancellor retaining jurisdiction of the cause for ultimate decision. (*Lake Lenore, Inc. v. Delaware, L. & W. R. Co.*, 113 N. J. Eq. 533, 168 Atl. 178; *Delaware, L. & W. R. Co. v. Breckenridge*, 56 N. J. 595, 40 Atl. 23; *Nashua Savings Bank v. Burlington Electric Light Co.*, 99 Fed. 14; *Green & C. St. Pass. Ry. Co. v. Moore*, 64 Pa. 79; *Fisher v. Carroll*, 46 N. C. 27; *Brown v. Cranberry Iron & Coal Co.*, 72 Fed. 96; *Decker v. Caskey*, 1 N. J. Eq. 427; *Watt v. Starke*, 101 U. S. 247, 25 L. Ed. 826.)

The mere fact that plaintiffs under section 84 of the Local Improvements Act might have compelled the city through a proceeding in mandamus to file its certificate of cost and completion did not and could not deprive equity of jurisdiction of this cause, inasmuch as this section does not empower the county court to order a refund of trust funds but merely to direct an abatement of unpaid special assessments if there is an overassessment. Neither does this section contemplate the concealment or conversion of a trust fund surplus and a situation such as is presented here could not have arisen if the city had obeyed the provisions of the statute.

Since there was involved herein a trust fund, its concealment and the failure of the city as trustee to perform its duty to administer and distribute such fund to its rightful beneficiaries, the circuit court functioning as a court of equity had jurisdiction of this cause and became the proper forum for the protection of the owners of the common trust fund.

A situation somewhat similar to that in the instant case was presented in *Rothschild v. Village of Calumet Park,* 350 Ill. 330, where it was found that the municipality had violated its trust by using special assessment collections to pay favorite bondholders instead of paying all bondholders pro rata. There the court said at p. 338:

"It is contended that the complainant's remedy at law is adequate and equity has no jurisdiction. There are two sufficient grounds upon which the jurisdiction of equity rests. The complainant's claim is for money had and received to the complainant's use and could be the basis of an action of assumpsit, but the amount of it could be ascertained only by an investigation of the accounts of the defendant, the books and papers in the possession of its officers, the books of the city collector, those of the county collector, the tax judgment, sales, redemption and forfeiture records of the county court for several years, all constituting a great volume of intricate accounts which could not be presented to a jury in such a manner as to enable them to arrive at a satisfactory conclusion as to the amount due. In such cases it is well settled that a court of equity has jurisdiction to entertain a bill for an accounting. An entire absence of a remedy at law is not necessary but the inadequacy and impracticability of the remedy is equally effective to furnish a ground for equity jurisdiction. (*Ely v. King-Richardson Co.,* 265 Ill. 148; *People v. Small,* 319 id. 437.) The jurisdiction of equity for the enforcement of trusts is another ground of its jurisdiction in this case. The enforcement of trusts is peculiarly within the province of a court of equity, and a case which has for its object the enforcement of a trust is a case in equity. Equitable jurisdiction is not taken away by the fact that the complainant has a remedy at law. (*Howell v. Moores,* 127 Ill. 67; *People v. Bordeaux,* 242 id. 327.) We have held that the proceeds of special assessments

are trust funds for the payment of the bonds issued for the cost of the improvement. (*Conway v. City of Chicago*, 237 Ill. 128.)''

The *Rothschild* case is directly in point and furnishes ample authority for the commencement and maintenance of this proceeding in equity since its object was the enforcement of a trust.

In defendants' brief it is stated that ''the only theory which can justify the allowance of $60,000 to the attorneys for plaintiffs from the amount available for rebate to the persons who paid special assessments levied for the construction of the Wacker Drive improvement is that the suit was properly instituted and maintained as a representative or class action. Only a cursory analysis of the origin and purpose of the device of the class action and its application is necessary to show that the present suit cannot properly be maintained as a class action.''

It is sufficient answer to the city's position in this regard that all the necessary elements of a representative or class action are present in this case. In defining a representative suit in *Hale v. Hale,* 146 Ill. 227, the court said at p. 257:

''A familiar illustration may be found in cases where the parties are so numerous that it is inconvenient or impossible to bring them all before the court, and it appears that they all stand in the same situation, and have one common right or one common interest, the operation and protection of which will be for the common benefit of all, and cannot be to the injury of any.''

Discussing the requisites for the institution of a representative suit in *Lee v. Hansberry,* 372 Ill. 369, the court said at p. 373:

''It thus appears that *Burke v. Kleinman, supra,* was a class or representative suit. It cannot be seriously contended that it was not properly a representative suit. There was a class of individuals who had

common rights and who needed protection. They were so numerous it would have imposed an unreasonable hardship and burden on them to require all members to be made parties to the suit. Under such circumstances we have repeatedly held that a court of equity has jurisdiction of representative suits, and where the remedy is pursued by a plaintiff who has the right to represent the class to which he belongs, other members of the class are bound by the result in the case, unless it is reversed or set aside in a direct proceeding. *Groves v. Farmers State Bank,* 368 Ill. 35; *Leonard v. Bye,* 361 id. 185; *Greenberg v. City of Chicago,* 256 id. 213.''

Plaintiffs clearly had the right to institute and maintain this proceeding as a class suit. They represented the class they belonged to. It not only would have been a great burden but it would have been impossible to have brought the 5,078 assessees into court. All having a like interest in the same fund, its discovery and its distribution, the instant action was brought for their common benefit and could not injure any of them. They all profit not only as a result of the decree entered herein, but also through plaintiffs' efforts in the county court whereby the surplus trust funds were not only protected but augmented. Therefore, all the requirements necessary for the commencement and maintenance of a representative suit are present here.

Defendants' final contention is that the complaint in this case was prematurely filed. It is unnecessary to discuss this contention since it has been completely answered by what has already been said.

For the reasons stated herein the decree of the circuit court is affirmed.

*Decree affirmed.*

FRIEND, P. J., and SCANLAN, J., concur.